United States District Court
District of New Jersey

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL COMPLAINT** |
| **v.** | : | **Mag. No. 14-7258** |
| **BARBARA BROWN and PHILIP CHARLES DE GRUCHY** | : | **Filed Under Seal** |

I, Myrna I. Williams, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

### SEE ATTACHMENT B & ATTACHMENT C

_Myrna I. Williams_
Myrna I. Williams, Special Agent
Federal Bureau of Investigation

Sworn to before me
and subscribed in my presence,

November 18, 2014
Date

at    Newark, New Jersey
City and State

Honorable Cathy Waldor
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

1

**ATTACHMENT A**

From at least as early as in or about August 2007 through in or about September 2011, in the District of New Jersey and elsewhere, defendants

**BARBARA BROWN and
PHILIP CHARLES DE GRUCHY**,

did knowingly and intentionally conspire and agree with each other, and with others known and unknown, to devise a scheme and artifice to defraud Company A and Company B, and to obtain money and property from Company A and Company B by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, caused matter, namely checks in payment for alleged consulting services, to be placed in a post office or authorized depository for mail, and placed with a private or commercial interstate carrier to be sent or delivered by the Postal Service and private or commercial interstate carrier, and to be taken or received from the Postal Service and private or commercial interstate carrier, contrary to Title 18, United States Code, Section 1341.

In violation of Title 18, United States Code, Section 1349.

1

## **ATTACHMENT B**

I, Myrna I. Williams, a Special Agent with the Federal Bureau of Investigation, having conducted an investigation and having spoken with other individuals and having reviewed reports and documents, have knowledge of the facts provided below. Because this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not included each and every fact known by the government concerning this investigation. Statements attributed to individuals are provided in substance and in part.

## **Relevant Entities and Individuals**

1.      At all times relevant to this complaint unless otherwise specifically noted:

A.      "Company A" was a leading international toy and juvenile products retailer headquartered in Wayne, New Jersey.

B.      "Company B" was an international manufacturer and retailer of luxury travel bags and accessories headquartered in South Plainfield, New Jersey.

C.      Defendant Barbara Brown ("Brown") was employed by Company A from in or about August 2007 through on or about April 2, 2010.   Brown was initially hired as the Director of Customer Relationship Management.   In or around 2009, Brown's title was changed to Director of Corporate Marketing, Key Initiatives.

D.       Defendant Philip Charles de Gruchy ("de Gruchy") was employed by Company B from in or about July 2010 through in or about November 11, 2011, as the Director of Global Customer Relations Management.

E.      Brown and de Gruchy resided together at an address in Park Ridge, New Jersey (the "Park Ridge Address"), in a home that they jointly owned.

F.      CEM Direct Marketing Services ("CEM") was purportedly a Canadian company engaged in marketing consulting services that was controlled by Brown and De Gruchy.

G.      BI Insights was purportedly a Canadian company engaged in marketing consulting services that was also controlled by Brown and de Gruchy.

1

## Overview of the Scheme to Defraud

2.      From at least as early as in or about August 2007 through in or about September 2011, Brown and de Gruchy conspired with each other and with others to defraud their respective employers, Company A and Company B. Pursuant to the scheme, Brown and de Gruchy caused their employers to enter into business relationships with CEM and BI Insights, sham companies that they secretly controlled.   Thereafter, Brown and de Gruchy caused the sham companies to send fraudulent invoices to their employers for work that they never completed.   Due to their positions at their respective employers, Brown and de Gruchy caused their employers to pay these fraudulent invoices by mailing checks to addresses in Canada that they controlled.   Pursuant to the scheme, Brown and de Gruchy defrauded Company A and Company B of approximately $3.072 million, which they used to pay, among other things, personal expenses such as mortgage payments, car loans, home renovations and furnishings, and credit card bills.

## The Scheme to Defraud

Brown Hires CEM as Consultant for Company A

3.      As a result of the high-level positions that she held with Company A, Brown was responsible for, among other things, an annual budget of approximately $30 million and had considerable discretion and authority to hire and pay contractors.

4.      On or about January 21, 2008, at the request of Brown, CEM was set up as a vendor by Company A's procurement group for the alleged purpose of evaluating a Request for Proposal ("RFP") for potential database vendors.

5.      From on or about November 5, 2007, through on or about March 4, 2010, CEM submitted more than sixty invoices to Company A totaling approximately $3,268,795.   CEM allegedly performed and billed Company A for four types of work: (a) "Segmentation Analysis," totaling approximately $476,000; (b) "Recency, Frequency, and Monetary Reports," totaling approximately $920,077; (c) "Review Requests for Proposal submissions," totaling approximately $82,730; and (d) a category stated as "other," totaling approximately $1,789,988.

6.      Brown approved all CEM invoices, with the exception of some early invoices for RFP assistance, which were approved by the procurement staff at her direction.

2

7.     From on or about February 20, 2008, through on or about April 14, 2010, Company A mailed all but one of the checks in payment of these invoices, through the U.S. Postal Service, using air mail envelopes addressed to the Canadian addresses provided on the CEM invoices.   The remaining check was mailed through the U.S. Postal Service, using regular mail.[1]   The initial address provided at the time the company was signed up as a Company A vendor was 33 Hazelton Avenue, Suite 66, Toronto, Canada (the "Hazelton Avenue Address"). In early to mid-2008, CEM's invoices began to reflect an address of 1 Yonge Street, Suite 1801, Toronto, Canada (the "Yonge Street Address").

8.     As a result of poor performance reviews, on or about March 22, 2010, Brown accepted an offer to separate from Company A.   Brown's last day working at Company A was several weeks earlier on March 5, 2010 although her separation agreement provided that she would be on paid vacation until her official termination date, which was April 2, 2010.

Brown Fraudulently Concealed Her Affiliation with CEM from Company A

9.     After Brown separated from Company A, Brown's replacement became aware of the numerous invoices from CEM and attempted to contact CEM using the telephone number and email address from a recent invoice; these attempts were unsuccessful.   Thereafter, Company A conducted an internal investigation.   That investigation revealed, among other things that: Brown and/or de Gruchy operated CEM as a sham company with the intent to defraud Company A; concealed their interests in CEM from Company A; controlled email addresses and the domain that belonged to CEM; fraudulently depicted another individual as the contact for CEM; controlled CEM's bank account; and converted the money that Company A paid CEM to their own benefit.   I along with other FBI agents, have confirmed the results of Company A's investigation, some of which are discussed below.

10.     For example, Company A's investigation revealed that CEM's website was registered to the Park Ridge Address that Brown had listed in her employment application as the residence where she lived with her "spouse," de Gruchy.

---

[1]   The total amount of the checks sent to CEM by Company A was approximately $3,268,795. After Brown was terminated and Company A began to investigate the payments, CEM refunded approximately $384,081 of approximately $476,000 previously billed for "segmentation analysis," claiming that the billing was for a "new project started but not moved along after Barbara left."   In addition, Company A placed a stop payment on a check for approximately $28,896 that had not been redeemed.   Thus, the net amount CEM billed and collected from Company A was approximately $2,855,818.

11.     Company A further discovered that the Hazelton Avenue Address, the initial address provided for CEM, was not a physical location, but instead was a mailbox at a Canadian rental business run by National Mailbox, Inc. Moreover, the Yonge Street Address was the address of a business engaged in receiving mail, forwarding telephone coverage during the day, and providing 24-hour voicemail service.

12.     Although Brown was CEM's sole contact person at Company A, records for the landline for her company extension, as well as her company-issued mobile phone, show that she never placed a call to, or received a call from, either of the two phone numbers provided to Company A for CEM.

13.     An individual named "Steven Shaw" was listed as the purported contact person for CEM on Company A's vendor records to lend credence to the fact that CEM was an independent and legitimate vendor.   There were three e-mail addresses associated with CEM – cem33@earthlink.net, steven@cemdirect.biz, and info@cemdirect.biz (collectively, the "CEM E-mail Accounts").   Brown's personal e-mail was [REDACTED]@mindspring.com (the "Mindspring Account").

14.     Company A records reveal that CEM purportedly began communicating with Brown from email addresses associated with the cemdirect.biz domain in the fall of 2008.  Despite the fact that these email addresses supposedly belonged to CEM or Shaw, the domain registration record for cemdirect.biz listed the Park Ridge Address as the physical address for the domain registrant.

15.     Further, on ten different days, during the two-year period that CEM purportedly performed work for Company A, there was at least one email from the Mindspring Account and one email from one of the CEM Email Accounts sent to Brown's Company A email account from the same originating IP address.[2] The fact that these emails were sent from the same IP address indicates that both communications originated from the same network, and possibly the same computer system.

16.     Each of the checks Company A issued to CEM and mailed to Canada was deposited into a Citibank account, held in the name of CEM, ending in 7749 ("7749 account") at a local branch located in White Plains, New York. The sole authorized signatory on that account was de Gruchy.[3]   Thereafter,

---

[2]  An IP address is a unique number assigned to a device to route data traffic to and from or through the device and the Internet.

[3]  When the 7749 account was opened at Citibank, de Gruchy was listed as CEM's 100% owner and member, with the business address listed as the Park Ridge Address.   In or about June

checks totaling more than $500,000 were written out of the CEM account payable directly to de Gruchy or Brown.   Additional checks were written out of the CEM account to Ontario LLC, in the approximate amount of $516,000 and to Silk Farm, Inc., in the approximate amount of $494,303, both companies belonging to de Gruchy.   Other checks were written directly out of the CEM account for items, including home furnishings and credit card bills.

17.    De Gruchy also used "Individual 1," a coconspirator not named as a defendant herein, to conceal the fact that he and Brown were recipients of the consulting fees paid by Company A to CEM.   In particular, de Gruchy wrote checks from the CEM, Silk Farm, and Ontario LLC Citibank accounts to Individual 1, and to an account at Chase Bank belonging to JSBW, LLC, an alleged interior decorating firm owned by Individual 1.   At de Gruchy's direction, between in or about November 2008 and in or about July 2010, Individual 1 wrote a total of more than $1 million in checks from his personal and JSBW Chase accounts payable to either Brown or de Gruchy.   Those checks were then deposited into Brown and de Gruchy's Citibank joint banking account, with Individual 1 retaining a percentage of the checks as a commission.   Funds deposited into Brown and de Gruchy's joint account were then used for, among other things, approximately $616,717 in home remodeling expenses for the Park Ridge Address, approximately $228,638 in mortgage payments for the Park Ridge Address, and to pay credit card bills.

CEM Fraudulently Billed Company A for Work that It did not Perform

18.    In or about July 2010, Company A sent an email request seeking documentation of CEM's work that was the subject of CEM's numerous invoices. CEM initially responded by an email that purported to be from Steven Shaw stating that its policy was to delete all documentation after sixty days.

19.    In or about August 2010, an individual claiming to be Steven Shaw, sent Company A approximately 43 emails with various attachments purporting to support the work CEM did for Company A.   An analysis of these attachments shows that the purported work product was either copied from other vendors' work, was related to other businesses, or did not correspond to the items on CEM's invoices.

---

2010, de Gruchy opened a second account for CEM, ending in 7395. The business account application stated that: de Gruchy would be the sole signatory; the mailing address for CEM was the Yonge Street Address; de Gruchy was the business Secretary and 40% owner; and Steven Shaw was purportedly the 60% owner.   In August 2010, de Gruchy requested that the 7395 account be closed.

20.    In particular, in or about February 2010, CEM invoiced Company A for completing a segmentation analysis that was previously performed by another vendor ("Vendor 1") at the request of Brown.   The CEM proposal dated February 24, 2010, was a near replica of the authentic proposal submitted by Vendor 1 to Brown a year earlier, on or about March 24, 2009.

21.    CEM also invoiced Company A for Recency, Frequency and Monetary Reports ("RFM reports") that it did not prepare.   RFM reports separate a company's customers into identifiable groups for marketing purposes.   In order to prepare this report, CEM would have needed access to certain data from Company A's sole database vendor ("Vendor 2").   CEM never received security clearance to access this data, and there are no records of data transfers from Vendor 2 to CEM.

22.    CEM also invoiced Company A for approximately $82,730 for assisting with a Request for Proposal, but no work product was found to support the sum paid by Company A.   Further, Company A paid approximately $1.789 million to CEM based on invoices that do not correspond to any noted work product.

23.    A review of the invoices emailed by CEM to Brown that remained in her Company A email account following her termination revealed that a number of these invoices were altered prior to their submission to Company A for payment, including six that contained changes in invoice amounts.   For example, invoice T2039 emailed to Brown by CEM had an amount of $24,960 listed, while the invoice that Brown actually submitted to Company A was for $147,560.   The date of this invoice and description were also changed.   No emails from CEM to Brown were discovered noting that the original invoices were incorrect and needed to be changed, and as noted above, Company A phone records do not show any communications between Brown and the telephone numbers associated with CEM.   Moreover, Company A could not identify any work product prepared by CEM in connection with these invoices.

24.    Notably, Brown had twelve invoices from CEM in her email that were never submitted to Company A for payment, totaling approximately $369,052. No inquiry was made by CEM following Brown's termination with respect to these unpaid invoices.

DeGruchy/Brown Fraudulently Concealed their Relationship from Company B

25.    At the end of 2009, de Gruchy and Brown both applied for the position of Director of Customer Relationship Management at Company B.   De Gruchy was hired for the position.   Information that they provided during their interviews did not reveal that they knew each other, let alone, resided together.

26.    As part of his job at Company B, de Gruchy was responsible for a data migration project designed to assist the company in marketing strategy through the collection of Company B's customer purchasing patterns.

27.    De Gruchy claimed to have expertise in overseeing the migration project, but insisted that he needed either an assistant or an outside consultant to work with him on the project.   In or about October 2010, de Gruchy obtained Company B's verbal approval to hire Brown as a consultant for the migration project.   At no time did de Gruchy reveal his personal or business relationship with Brown.

28.    From in or about November 2010 through in or about November 2011, Brown or BI Insights ultimately submitted invoices for alleged work relating to the data migration project, which totaled approximately $354,410. To receive payment, Brown provided the invoices, for work she purportedly performed, directly to de Gruchy, who, in turn, created a payment order in Company B's system that was submitted to its accounts payable department for payment.[4]

29.    Between on or about November 4, 2010, through on or about September 22, 2011, Company B mailed checks to the Hazelton Avenue Address, payable to either Brown or BI Insights, using the U.S. Postal Service for work Brown purportedly performed for Company B.   The checks to Brown and BI Insights totaled approximately $195,560, and approximately $21,275, respectively.

30.    On or about November 11, 2011, de Gruchy was terminated by Company B based on job performance issues.

31.    After de Gruchy was fired from Company B, he repeatedly contacted employees of Company B attempting to get Brown's outstanding invoices paid. He did not ask about other vendors.   De Gruchy's supervisor learned of the personal relationship between de Gruchy and Brown when she discovered an email message in which they discussed a mortgage that they had together.

Brown and de Gruchy Frauduently Billed Company B for Unperformed Work

32.    De Gruchy approved all of the invoices submitted by Brown and BI Insights, as well as her Statement of Work forms, which provided detail on the

---

[4]  Four of these invoices, totaling approximately $124,150, were received by Company B directly from Brown subsequent to de Gruchy's termination.   Company B did not pay these invoices as the services were neither authorized nor delivered.

services the vendor was going to provide and how much they were to be paid. The invoices were mainly under $15,000 and, therefore, were within de Gruchy's signature authority.   One of the Statement of Work forms, which purported to obligate Company B to pay Brown a fee of $205,000, was purported to be signed by the Chief Merchandising Officer of Company B, but was not, and exceeded the amount that Company B had approved for consulting services on the migration project.

33.    After de Gruchy was terminated, Company B asked Brown to document the work product that supported her invoices as well as the number of hours that she had worked.   Brown provided a flashdrive to Company B as proof of her work.   Company B also reviewed email exchanges between Brown and de Gruchy that were located in de Gruchy's work email history.   An examination of the email exchanges and flashdrive revealed that certain invoices submitted by Brown and BI Insights were duplicates of each other and, more importantly, there was not any meaningful work product.   In many cases, Company B information was inserted into templates previously created for other companies. Further, Brown did not have access to Company B's customer database and therefore could not have generated the work product that she claimed to produce.

34.    Company B eventually hired a new employee to migrate the database.   This employee needed to start the process over from scratch.

8

**ATTACHMENT C**

**FORFEITURE ALLEGATIONS**

1.      The allegations contained in all paragraphs of this Complaint are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      The United States hereby gives notice to the defendants charged in this Complaint that, upon conviction of the offense charged herein, the government will seek forfeiture, in accordance with Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offense, including but not limited to the following:

      a. A sum of money equal to approximately $3.072 million in United States currency, for which the defendants are jointly and severally liable; and

      b. A sum of money equal to approximately $845,355 in United States currency representing proceeds of the fraud traceable to the real property known as 8 Etheridge Place, Park Ridge, New Jersey.

3.      If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

      a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with, a third party;

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be subdivided without difficulty,

the United States of America will be entitled to forfeiture of substitute property up to the value of the property described above in paragraph 2, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

9